[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action to quiet title. The ultimate issue is whether a claimed right of way exists over a part of the plaintiffs' property in favor of the defendants' land. Both properties are in the vicinity of Pepperbox Road and Miner Lane in Waterford.
Pepperbox Road and Miner Lane both run in a roughly north-south direction, parallel to each other for a short distance. Miner Lane is west of Pepperbox Road. Miner Lane's dead-ends immediately west of the boundary between plaintiffs' and defendants' properties.
Plaintiffs, Robert and Norma Branch, husband and wife, own a substantial piece of property located immediately west of Pepperbox Road. Their property runs from Pepperbox Road west to CT Page 12857 a line which would be a straight line extension of Miner Lane. The Branches' land is immediately south of the defendants land.
The plaintiffs, Paul and Diana McMasters are husband and wife. She is the Branches' daughter. In 1989, the Branches conveyed land to the McMasters. It is generally located in the southwest corner of land the Branches owned. Also, the Branches conveyed in fee an access way from Pepperbox Road west and then southwest to the main property conveyed to the McMasters. Exhibits 8 and 9. This access way is near the boundary between the Branch and Occhionero property line for some distance. The right of way claimed by the Occhioneros crosses this access way.[1]
Defendants, Angelo and Norma Occhionero, husband and wife, own a substantial piece of land located immediately north of the Branches' land. It is located immediately east of Miner Lane. It runs east towards, but not all the way to, Pepperbox Road; properties of third parties lie between defendants' land and Pepperbox Road.
Defendants' land has no frontage on Pepperbox Road;
The right of way which defendants claim in this action begins at a break in a stone wall which marks the common boundary. It meanders in a southeasterly direction and comes through the plaintiffs' house yard which is located in the very southeast part of plaintiffs' property. This claimed right of way would afford defendants' property access to and from Pepperbox Lane. Without it, defendants have no access to Pepperbox Lane.
 I
Defendants' primary claim is that they have a right of way created by deed. According to defendants, it was created in a May 1, 1986 deed from Pascal Beckwith to a Dr. Borland. In that deed, Beckwith conveyed "a certain pasture lot in said Waterford commonly called the Common Pasture containing 33 and 3/4 acres more or less . . . to John Borland." After describing the land conveyed by metes and bounds, the deed states "said premises are subject to a right of way over the same to John Gardner and his heirs [?].[2]" Later in the warranty and covenants of title part of the deed, it is stated "that the same is free from all encumbrances whatsoever except the right of way aforesaid CT Page 12858 . . ." Plaintiff's Exhibit 1.
The Branches now own the property Beckwith conveyed to Borland. In all the deeds beginning with that of Beckwith to Borland down to the deeds into the Branches, the language, "said premises are subject to a right of way over the same to John Gardner and his heirs [?]" is repeated. Exhibits 1 — 6.
At the time of Pascal Beckwith's conveyance to Borland, May 1, 1886, Pascal Beckwith did not own the property which is now defendants and which defendants claim is the dominant estate, i.e. the beneficiary of the right of way. A John Gardner owned that property. That property is now the property of the defendants, the Occhioneros.
Defendants, the Occhioneros, acquired the property in 1978. Tr. 1/119,[3] Exhibit 14. The deed by which they acquired title does not mention the claimed right of way. Exhibit 14. In fact, none of the deeds in their chain of title mentions the right of way. Exhibits 14-23.
As of May 1, 1886, John Gardner was the owner of what is now defendants' land.
If defendants are correct that their land, then owned by a John Gardner, was the land intended to be benefitted [benefited] by the right of way "then being created," it follows that the grantor, H. Pascal Beckwith, did not own the land to be benefitted [benefited] by the right of way.
The "unity of title doctrine" is a part of our law. Curtinv. Franchetti, 156 Conn. 387 (1968); Stankiewicz v. Miami BeachAssn., Inc., 191 Conn. 165 (1983); Ozyck v. D'Atri, 206 Conn. 473
(1988); Carbone v. Vigliotti, 222 Conn. 216 (1992); Dean v.Riley, 31 Conn. App. 87 (1993).
 "No right of way appurtenant can be created without a dominant as well as a servient estate. Deregibus v. Silberman Furniture Co., 121 Conn. 633, 637, 186A. 553. The dominant estate enjoys the benefit of the way, and the servient estate bears the burden. The way can become legally attached to the dominant estate only if the same person has unity of title to both the way and the dominant estate. 25 Am.Jur.2d 426, Easements and Licenses, 11; 28 C.J.S. 634, Easements, 4. A way CT Page 12859 appurtenant cannot be used for the benefit of land other than the dominant estate. 2 Thompson, Real Property (1961 Repl.) 322, p. 76." Curtin v. Franchetti, 156 Conn. 387, 389 (1968).
The unity of title doctrine has been described by the Supreme Court as "this fundamental principle of law."Stankiewicz v. Miami Beach Assn., Inc., 191 Conn. 165, 170
(1983).
The "unity of title" doctrine requires that the grantor creating an easement appurtenant must, at the time of the creation of the easement, own both the dominant and servient estate.
As of May 1, 1886, Pascal Beckwith did not own the property which is now defendants; John Gardner did. John Gardner had acquired "the woodlot" in 1858. Exhibit 21. This is the claimed dominant estate. There was not a unity of title in H. Pascal Beckwith on May 1, 1886, the time when defendants claim the right of way was created. Ozyck v. D'Atri, 206 Conn. 473 (1988).
Applying the unity of title doctrine, the court holds no right of way in favor of John Gardner, or any land owned by John Gardner, was created by the Beckwith-to-Borland deed dated May 1, 1886, plaintiffs' exhibit 1.
Defendants claim that the unity of title doctrine should not be decisive in this case. They claim that it is all but dead in Connecticut. The Supreme Court may be poised to nullify it in an appropriate case. In Ozyck v. D'Atri, 206 Conn. 473 (1988), the Court observed the unity of title doctrine "had fallen into disfavor with contemporary commentators as an obsolete vestige of feudalism that frustrates the intentions of the grantor" and "has been rejected in several jurisdictions that had formerly followed the rule." Id. @ 479. However, the Court declined to abandon the rule deciding "to defer any reconsideration of the rule adopted in Curtin until we are presented with an appropriate case where the intention of the grantor to create in his deed an interest in someone other than the grantee is reasonably clear." [Footnote omitted.] Ozyck v. D'Atri, 206 Conn. 473, 479 (1988). SinceOzyck, the Supreme Court and the Appellate Court have followed the unity of title doctrine. See Carbone v. Vigliotti, 222 Conn. 216
(1992); Dean v. Riley, 31 Conn. App. 87 (1993). In Carbone,
the Supreme Court stated that it [Carbone] "affords no more CT Page 12860 appropriate an occasion than did Ozyck for reconsideration of the unity of title doctrine." 222 Conn. @ 224.
Even if it were "reasonably clear" that the grantor, H. Pascal Beckwith, intended to create an interest in John Gardner who was not the grantee of the land conveyed and a "stranger to the title," it is not for this trial court to change "this fundamental principle of law;" that may be a role for the Supreme Court alone.
 II
The defendants also claim they have a right of way by prescription. See Answer, Special Defenses and Counterclaim, June 15, 1992, Special Defenses, ¶ 3, Counterclaim, First Count. [108]
The law on easements by prescription is well settled. It has a statutory and a common law base.
 "No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years." C.G.S. § 47-37.
 "Prescriptive easements are recognized in this state. General Statutes § 47-37; Klar Crest Realty, Inc. v. Rajon Realty Corporation, 190 Conn. 163, 459 A.2d 1021 (1983). To establish an easement by prescription it is absolutely essential that the use be adverse. It must be such as to give a right of action in favor of the party against whom it has been exercised. Whiting v. Gaylord, 66 Conn. 337, 344, 34 A. 85 (1895). In order to prove such adverse use, the party claiming to have acquired an easement by prescription must demonstrate that the use of the property has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right. Andrzejczyk v. Advo Systems, Inc., 146 Conn. 428, 431, 151 A.2d 881 (1959); Klar Crest Realty, Inc. v. Rajon Realty Corporation, supra, 168; Putnam, Coffin Burr, Inc. v. Halpern, 154 Conn. 507, 515, 227 A.2d 83 (1967). There can be no claim of right unless the use is unaccompanied by any recognition of his right CT Page 12861 [of the servient tenement] to stop such use. A use by express or implied permission or license cannot ripen into an easement by prescription. Sachs v. Toquet, 121 Conn. 60, 66, 183 A. 22 (1936); Klar Crest Realty, Inc. v. Rajon Realty Corporation, supra. Connecticut Law refrains from extinguishing or impairing property rights by prescription unless the party claiming to have acquired an easement by prescription has met each of these stringent conditions." Westchester v. Greenwich, 227 Conn. 495, 501 (1993).
"Although these principles are firmly rooted in our statutory and common law," id., their application to a particular fact situation is not an easy chore. And, the party asserting an easement by prescription bears the heavy burden of establishing the facts which would establish the prescriptive easement. The proof must be by a fair preponderance of the evidence.McCullough v. Waterfront Part Assn., Inc., 32 Conn. App. 746, 753
(1993).
One claiming a right of way by prescription or adverse user must also establish that the user was done by the owner of the claimed dominant estate as an appurtenance to his ownership of the dominant estate.
Defendants have not specified when the period of prescriptive use by them or their predecessors in title occurred. Defendants assert "THE DEFENDANTS AND THEIR PREDECESSORS IN TITLE HAVE USED THE RIGHT OF WAY IN AN OPEN, VISIBLE, CONTINUOUS AN UNINTERRUPTED MANNER FROM 1858 TO THE PRESENT." Defendants' Post Trial Memorandum, February 22, 1994, p. 10. That claim is not borne out in the record.
The defendants acquired the property in issue in 1978. Exhibit 14, Tr. 1/119. In 1982, the plaintiffs filed a "Notice of Dispute of Right of Way" on the land records.[4] Plaintiffs' Exhibit 13. This stopped the running of any period of prescription. The defendants acquired no prescriptive easement during the period of their ownership.
The Hayeses owned the property immediately before the defendants. The Hayeses acquired the property in June, 1969. Exhibit 16. There is no evidence the Hayeses used the Branch property in any manner at all. The Hayeses expressly disclaimed any use or claim to any use of the property which could lead to a CT Page 12862 prescriptive easement. Plaintiffs' Exhibits 11 and 12. No use of the property during the Hayeses' ownership occurred which could lead to a prescriptive easement.
Jane Gardner, Ruth Shipman and Dorothy Shipman, direct descendants of John Gardner, owned the property just prior to the Hayeses. They acquired interests in the property at various times. Dorothy Shipman and Ruth Shipman, sisters, expressly disclaimed any use or claim to any use of the property which could lead to a prescriptive easement. Plaintiffs' Exhibit 10.[5]
Dorothy Shipman testified her family never asserted a right of way over what is now the Branches' land. Deposition of Dorothy Shipman, p. 23, Exhibit 9. No use of the property during the time the Shipman sisters owned an interest in the property occurred which could lead to a prescriptive easement. Just when the Shipman sisters acquired an ownership interest in the property is not clear.[6] It was no later than 1949. See Certificate of Descent, Exhibit 19.[7] The Shipman sisters probably became owners well before the time the Certificate of Descent, Exhibit 19, was recorded in the land records.
The only evidence defendants offered to establish a prescriptive right of way over the plaintiff's property was the testimony of the defendant, Angelo Occhionero. The court treats his testimony with caution.
On direct examination, Occhionero fudged the time of his first knowledge of the claimed right of way saying that in 1924, when he was six years old, he went to the property with his father and uncle via the claimed right of way over what is now the plaintiffs' land. He was born in 1918. Tr. 1/119-120. On cross examination, when shown his prior deposition testimony and an interrogatory response, Occhionero said his first knowledge of the claimed right of way was sometime in 1926 when he was eight. Tr. 2/7-8, 12-13; Exhibit 4.
The court finds that at the earliest, it was sometime in 1926, when Occhionero was first aware of the alleged use of the claimed right of way.
Occhionero's father and uncle worked for the Gardner family. The Gardners then owned what is now Occhionero's property. It was the Gardners' woodlot. The Gardners' homestead and farm were located on Niles Hill Road, a quarter of a mile down [south] Pepperbox Road from the southwest corner of what is the CT Page 12863 plaintiffs' property. Tr. 1/119-121.
Occhionero's father and uncle cut about 30 cords of wood each year for the Gardners. Tr. 1/120. That wood was hauled out by horse and wagon over the claimed right of way. Tr. 1/121. Occhionero saw his father and uncle hauling the wood out over the claimed right of way from sometime in 1926 until either 1929 or 1930. That wood was used in "two big furnaces in the greenhouse" on the Gardners' farm and the three or four houses there. Deposition testimony of Dorothy Shipman, pp. 26-27, 31. Exhibit 9. Occhionero did not testify about the number or frequency of trips over the claimed right of way. Occhionero said the woodlot, and presumably the claimed right of way, was so used until the Gardner farm was closed in 1929 or 1930. Tr. 2/10-11,15-16.
Occhionero also saw Charles and Isaac Gardner use the claimed right of way. During the period 1926-1929 or 1930, he saw them use it a total of 5 or 6 times. He never saw either of them drive a motor vehicle over the claimed right of way. Tr. 2/9-10. He did not see either of the Gardner brothers use the claimed right of way after 1930.
The court does not know how many crossings of the property it took to cut and haul out 30 cords of wood each year. The court does not know if this activity was concentrated during a particular time or times each year. Nor does the court know whether it took place sporadically throughout each year. Whether this use of the claimed right of way during 1926-1930 was "continuous" is problematic.
There is no evidence as to whether or not the Gardners' use of the alleged right of way was ever interrupted during the years 1926 — 1930. There is no basis for a finding that it was uninterrupted.
Defendant must prove the use was "open" and "notorious." The court finds the use from 1926 to 1930 was not hidden or done furtively in the stealth of the night. Thus, it was "open."
Whether it was "notorious" is another question.
 "The requirement that an adverse possession be `notorious' in the sense of `being or constituting something that is commonly known: well known' CT Page 12864 (Webster, Third New International Dictionary) is obviously to give actual notice to an owner that a claim contrary to his ownership is being asserted or to lay a foundation for a finding of constructive notice. Pepe v. Aceto, 119 Conn. 282, 287, 175 A. 775; Schroeder v. Taylor, 104 Conn. 596, 605, 134 A. 63; School District v. Lynch, 33 Conn. 330, 334; 3 Am.Jur.2d, Adverse Possession, 47." Robinson v. Myers, 156 Conn. 510, 518 (1968).
There is nothing in the record which would even tend to establish that the owner(s) of what is now the Branch property knew of the claimed prescriptive use of the property during the period 1926 to 1930. Occhionero testified that Judge Geary (John) owned the property during the 1920's. Tr. 2/11. He also testified that Judge Geary and the Gardners were friends. Tr. 2/12. Occhionero says he had seen John Geary. Tr. 2/34. Occhionero also testified that Judge Geary died in the early 1930's. Tr. 2/12. "John C. Geary . . . died at Daytona, Florida, on the 16th day of March, A.D. 1928." Land Certificate, d. April 10, 1928. Exhibit 9A.
There is no evidence that John Geary or Delia Geary lived on the property during the period 1926 until his death in March 1928.[8] If there were evidence they lived there, it would be evidence tending to show they might have known of the use of this property by the Gardners, and thus perhaps "notorious." But there is no such evidence.
Occhionero also testified that what is now the Branches' house was there "as long as I remember," "Back to the twenties." He did not remember who, if any one, lived there. Tr. 1/125. There is no testimony as to who, if any one, lived in that house before the Branches moved there in 1947.
Similarly, there is no evidence that Delia Geary ever lived on the property. She probably did not. The 1943 deed by which her estate conveyed the property describes her as "late of the Town and County of New London. . . ." Exhibit 3.
There is no evidence that either John or Delia Geary ever knew of the Gardners' or anyone else's use of the claimed right of way.
There is nothing in the record upon which the court could CT Page 12865 find that the Gearys had actual knowledge of the claimed prescriptive use of the property in the during the period 1926 to 1930. The court is mindful that the area was rural. The court cannot find that the Gardners' use of the claimed right of way, as represented by Occhionero in his testimony, was so extensive that the Gearys must have known of it. The evidence does not convince the court that the extent of the use during this period was so great that the Gearys were on constructive notice of a prescriptive use of the property. The court does not find or conclude that the use during the late 1920's was "notorious."
The record is void of any evidence that the Gardners' claimed use of the claimed right of way from 1926 to 1930 was made under a claim of right. Thus the court cannot conclude that it was used under a claim of right.
The defendants have failed to prove by a preponderance of the evidence that the Gardners' use of the claimed right of way during the period 1926 to 1930 was continuous, uninterrupted, notorious, or made under a claim of right.
No use of the claimed right of way occurred during the period 1926 to 1930 which could lead to a prescriptive easement.
Occhionero also testified his father went on the woodlot to cut wood for himself during the 1930's until "up through about 1940." Tr. 2/16. There was no evidence of the extent of his father's use of the Gardner woodlot for his own use. The court presumes that his woodcutting for his own use was less than the 30 cords each year that were cut and hauled for the Gardners during the period 1926 to 1930. It is not clear if he used the claimed right of way when doing this woodcutting for himself. Occhionero, upon cross examination by the plaintiffs' attorney, testified as follows:
 Q. And your uncle stopped going on the path [claimed right of way] through my clients' property once the Gardners closed their farm, is that correct?
A. Yes
Q. And that was about 1929, 1930.
A. Yes. CT Page 12866
 Q. And your uncle stopped off using the pathway through my clients' property in the 1930's. Is that right?
A. Yes.
 Q. And am I also correct that your father went on the lot to cut wood for himself up through about 1940? Is that right?
A. Yes.
Tr. 2/16.
Based on this testimony, the court would be hard pressed to find that Occhionero's father even used the claimed right of way during the 1930's in connection with his personal use of the Gardners' woodlot. There is no evidence where Occhionero's father lived during the 1930's. Thus there is no evidence to establish whether it was likely that the father used the pathway from Pepperbox Road rather than Miner Lane to get to and from the woodlot when gathering the wood for his own personal use. Certainly there is no evidence that any such use was extensive enough to be deemed "continuous."
Occhionero also testified that after the 1938 hurricane, his father had an agreement with the Gardners to remove the trees blown down in the hurricane. He did not say when that work took place or how long it took.
When discussing the hurricane cleanup work, Occhionero was asked how his father got to the woodlot. Occhionero answered: "He went in through Miner Lane and Pepperbox. Both ways." By "Pepperbox," Occhionero meant the pathway through the Branches' property. Tr. 1/123.
Based on Occhionero's testimony regarding his father's use of the claimed right of way during the 1930's, the court does not find that use was "continuous."
And for the same reasons set forth above when discussing 1926 to 1930, the court cannot conclude that the use during the 1930's was uninterrupted, notorious, or made under a claim of right. CT Page 12867
Nor is there evidence that Occhionero's father use of the woodlot and the claimed right of way was done as an appurtenance to the Gardner owned woodlot.
No use of the claimed right of way by Occhionero's father occurred during the 1930's which could lead to a prescriptive easement.
Occhionero himself stopped using the pathway over the Branches' property in 1938. Tr. 2/18. His use of the property during the 1930's appears to have been as a shortcut to town and New London. Tr. 1/123-4. There is nothing to indicate it was done under the auspices of the Gardners as an appurtenance to their ownership of the woodlot.[9]
Angelo Occhionero served in the Army during World War II from 1943 to 1946. In 1946 and 1947 Occhionero says he did some "birching" on the Gardner property. The "birching" was done on the Gardner woodlot with the permission of the Gardners. Occhionero says he used the claimed right of way when doing the "birching" in 1946 and 1947. Tr. 2/20. There is no evidence that Occhionero had the Gardners' permission to use the pathway when doing the "birching." This was the only use he made of the claimed right of way in the 1940's. Tr. 2/20.
Occhionero's only use of the claimed right of way during the 1950's and 1960's "was to walk over it a few times." Tr. 2/20-21.
Occhionero's use of the claimed right of way during the 1930's and 1940 would not warrant a finding that it was continuous. Again, for the same reasons set forth above when discussing 1926 to 1930, the court cannot conclude that Occhionero's own use during the 1930's was uninterrupted, notorious, or made under a claim of right. The court cannot find that his use of the right of way was done under the auspices of the Gardners then owning the dominant estate; his use was not as an appurtenance to the claimed dominant estate.
Even if Occhionero s testimony were taken at face value, which the court does not, defendants have not shown the requisite use which would ripen into an easement by prescription. He testified of the use of the right of way from 1926 to 1930, use incident to cleaning up after the 1938 hurricane, and some use in 1946 and 1947. The use of the right of way by the Gardners, which includes those working for the Gardners, certainly was not CT Page 12868 continuous and uninterrupted for 15 years. And there is serious doubt that it was open and/or notorious.
The court is somewhat wary of the 1993 recollections of Dorothy Shipman. She then did not remember she had ever owned the property. Exhibit 9, p. 6. However, she did testify that the Gardner family never claimed a right of way over what is now plaintiffs' property. That testimony is corroborated by her and her sister Ruth's 1982 statement, Exhibit 10. Her testimony and Exhibit 10 are uncontroverted.
The court has admitted her entire deposition. Exhibit 9. The court puts little credence in her recollection of a day long ago when her mother pointed out and spoke of a right of way from Pepperbox Road to the woodlot. And it seems to the court that her location of that supposed right of way was further north on Pepperbox Road than where defendants claim a right of way, i.e. far from the Branches' houseyard. In any event, the court does not accept her testimony as establishing the existence of a right of way the defendants claim.
Whether the Gardners used the claimed right of way with the permission of the then owners of the plaintiffs' property, the Gearys, is not in the record. According to Occhionero, the Gearys and the Gardners were friends. The court could infer the use was permissive. The record lacks evidence that the Gardners' use was adverse.
There was no evidence of any use of the plaintiffs' property prior to 1926 which could lead to a prescriptive easement.
There is no evidence that any of defendants' predecessors in title used the supposed right of way "under a claim of right."
Defendants failed to establish that the claimed use of the right of way over the Branch property was as an appurtenance to the Occhionero's property. There is no evidence the Gardners used or claimed the right of way as an appurtenance to what is now the defendants' property. Although the woodlot is contiguous to what is now the Branches' land, it is equally plausible that the right of way mentioned in the 1886 deed was meant to be appurtenant to the Gardner homestead and farm affording a shortcut to Miner Lane, the center of town or village, and the route to New London. CT Page 12869
The defendants undertook a heavy evidentiary burden in claiming an easement by prescription. They have not met that burden; they have not shown by a fair preponderance of the evidence that they or their predecessors in title gained a right of way by adverse user.
 III
Defendants "claim an interest in the right-of-way in question as an appurtenance to the Occhionero parcel. The defendants allege that this right-of-way in [Sic] an old public way in existence for many years. Moreover, the defendants claim that the predecessors in title of the plaintiffs Branch, allowed the dedication of the right-of-way to the public, and that there as [Sic] been an implied acceptance by the public at large of this dedicated right-of-way by the use and enjoyment of said right-of-way for the purpose of passage of persons and vehicles from at least 1859 to the present." Defendants' POST TRIAL MEMORANDUM OF LAW, February 22, 1994, pp. 18-19.
The way which defendants claim is or was public was a shortcut between Pepperbox Road and Miner Lane. One end of the shortcut, according to defendants, was at the southeast corner of the Branch property at Pepperbox Road. The other end was on the Occhionero property at Miner Lane. The claimed public way crossed both the Branch and Occhionero properties. At the property line marked by a stone wall, it went through an opening in the stone wall.
Angelo Occhionero was asked if the public way he claims crossed the Branch property also crossed his property.
 Q. Am I correct that you do not allow the public at large to cross your property to get to Miner Lane?
A. Yes.
 Q. You have stopped people who you do not know who have tried to drive over your property to get to Miner Lane, have you not?
A. Yes.
 Q. And your position is there is no public right of way over your property to get to Miner Lane, is that right? CT Page 12870
A. Right.
Tr. 2/30-31
This testimony eviscerates defendants' claim regarding a public right of way. It undercuts the legitimacy and good faith of all of the defendants' claims.
Defendants base their public highway claims on the principles of "dedication" and "acceptance."
 "Dedication is an appropriation of land to some public use, made by the owner of the fee, and accepted for such use by and in behalf of the public." Whippoorwill Crest Co. v. Stratford, 145 Conn. 268, 271, 141 A.2d 241 (1958); see Crescent Beach Assn. v. East Lyme, 170 Conn. 66, 71, 363 A.2d 1045 (1976); Wamphassuc Point Property Owners Assn. v. Public Utilities Commission, 154 Conn. 674, 680-81, 228 A.2d 513 (1967); 23 Am.Jur.2d, Dedication 1. "Both the owner's intention to dedicate the way to public use and acceptance by the public must exist, but the intention to dedicate the way to public use may be implied from the acts and conduct of the owner, and public acceptance may be shown by proof of the actual use of the way by the public." Wamphassuc Point Property Owners Assn. v. Public Utilities Commission, supra, 681. See Johnson v. Watertown, 131 Conn. 84, 89, 38 A.2d 1 (1944); LaChappelle v. Jewett City, 121 Conn. 381, 185 A. 175 (1936); New London v. Pequot Point Beach Co., 112 Conn. 340, 344, 152 A. 136 (1930). Thus, two elements are essential to a valid dedication: (1) a manifested intent by the owner to dedicate the land involved for the use of the public; and (2) an acceptance by the proper authorities or by the general public. DiCioccio v. Wethersfield, 146 Conn. 474, 479, 152 A.2d 308 (1959). No particular formality is required in order to dedicate a parcel of land to a public use; dedication may be express or implied. Whippoorwill Crest Co. v. Stratford, supra, 271. Whether there has been a dedication and whether there has been an acceptance present questions of fact. DiCioccio v. Wethersfield, supra, 479; Whippoorwill Crest Co. v. Stratford, supra, 272; Phillips v.CT Page 12871 Stamford, 81 Conn. 408, 411, 71 A. 361 (1908)." Meshberg v. Bridgeport City Trust Co., 180 Conn. 274, 279 (1980).
 "From early times, under the common law, highways have been established in this state by dedication and acceptance by the public." Wamphassuc Pt. Prop. Owners Assn. v. Public Utilities Commission, 154 Conn. 674, 680, 228 A.2d 513 (1967). The essential elements to be proved are the owner's unequivocal intention to dedicate the way to public use, and a general use by the public over a period long enough to indicate that it is acting on the basis of a claimed public right resulting from the owner's dedication. Lynch v. West Hartford, 167 Conn. 67, 78, 355 A.2d 42 (1974). Since both of these issues are questions of fact; Johnson v. Watertown, 131 Conn. 84, 90, 38 A.2d 1 (1944); our function is limited to determining whether the decision of the trial court was clearly erroneous. Practice Book 3060D; Pandolphe's Auto Parts, Inc. v. Manchester, 181 Conn. 217, 221, 435 A.2d 24 (1980)." Ventres v. Farmington, 192 Conn. 663, 666-7 (1984).
There is no testimony that the public used a way over what is now plaintiffs' property during the 19th Century.
There are public records which indicate a 1882 town meeting authorized a study or survey to determine if a highway should be built in the vicinity of plaintiffs' land. But a town meeting five years later, "Voted To accept report of Selectmen in regard to survey and layout of highway Voted not to build highway." Exhibits 3, 4, and 5. In any event, the court could not determine from these records that the proposed road crossed the land now owned by the plaintiffs.
Defendants claim the so-called "Beers Map" shows a public road in the same place where the defendants claim they have a right of way over the plaintiffs' property. Plaintiffs' objected to the admission of the "Beers Map," Exhibit 8. The court reserved decision on its admissibility. The court has considered the "Beers" Map as a full exhibit. Exhibit 8.
Defendants' witness, William E. Kent, a licensed and registered land surveyor since 1980, testified it was his opinion that the "Clark's Lane" shown on the "Beers Map" is in CT Page 12872 substantially the same location as the right of way defendants claim crossed both parties' land. Tr. 1/87-92. The court does not read the "Beers Map" that way. The court does not find the Clark's Lane shown on the "Beers Map" crossed what is now plaintiffs' land as defendants claim. Nor can the court find that "Clark's Lane" was ever a public highway.
There is no evidence establishing a public use of a way over what is plaintiffs' property in the early 20th Century[.]
There is no testimony from anyone regarding the use of the claimed right of way before 1926. Angelo Occhionero testimony of its use began with his recollections beginning in 1926. See pp. above. His testimony would not warrant a finding of a public use, i.e. dedication and or acceptance. Tr. 1/124, 130, 2/16, 17, 20, 21, 28-32, 34, 37, 39-42. His testimony about the right of way during the late 1920's and 1930's focused on the use by the Gardners' and Occhionero's father and uncle. He said little, if anything, about the public's use thereof. He didn't see anyone else use the right of way during the 1940's and 1950's. Tr. 2/20-21.
The Branches have lived on the property since 1947. The court accepts their testimony that there was no use of their property since 1947 which would constitute either dedication or acceptance.
There is no evidence that any owner of what is now the plaintiffs' property ever manifested an intent to dedicate any part of the property to a public use. Nor is there evidence that the general public ever used the property to such an extent that the acceptance by the general public may be inferred. The testimony of Patsy Donatello, Tr. 2/45-54, and Sydney Tuccio, Tr. 2/55-64, do not come near to establishing dedication and acceptance.
The defendants have not sustained their burden of proving the existence of a public highway.
 IV
The defendants' claims must also be rejected because of the Marketable Record Title Act, C.G.S. §§ 47-33b to 47-331. The court views that Act as largely unintelligible. Thankfully, the Supreme Court has given an explanation, in English, of its main CT Page 12873 thrust:
 "As applied to this case and subject to certain exceptions, the Marketable Title Act, General Statutes 47-33b et seq., declares null and void any interest in real property not specifically described in the deed to the property which it purports to affect, unless within a forty year period, a notice specifically reciting the claimed interest is placed on the land records in the affected land's chain of title." [Footnote omitted.] Schultz v. Sybertsen, 219 Conn. 81, 84 (1991).
The Act contains several critical definitions:
 (a) "Marketable record title" means a title of record which operates to extinguish such interests and claims, existing prior to the effective date of the root of title, as are stated in section 47-33e;
 (b) Records means the land records of the town where the particular land is located;
 (c) "Recorded" means recorded as provided by section 47-10 or section 49-5, as the case may be;
 (d) "Person dealing with land" includes a purchaser of any estate or interest therein, a mortgagee, an attaching or judgment creditor, a land contract vendee, or any other person seeking to acquire an estate or interest therein, or impose a lien thereon;
 (e) "Root of title" means that conveyance or other title transaction in the chain of title of a person, purporting to create or containing language sufficient to transfer the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined. The effective date of the root of title is the date on which it is recorded;
 (f) "Title transaction" means any transaction affecting title to any interest in land, including, but not limited to, title by will or descent, by public CT Page 12874 sale, by trustee's, referee's, guardian's, executor's, administrator's, conservator's or committee deed, by warranty or quitclaim deed, by mortgage or by decree of any court.
C.G.S. § 47-33b.
The key provision of the Marketable Record Title Act is section 47-33e. It reads:
 "Prior interests void. Subject to the matters stated in section 47-33d, such marketable record title shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims or charges whatsoever, the existence of which depends upon any act, transaction, event or omission that occurred prior to the effective date of the root of title. All such interests, claims or charges, however denominated, whether legal or equitable, present or future, whether those interests, claims or charges are asserted by a person sui juris or under a disability, whether that person is within or without the state, whether that person is natural or corporate, or is private or governmental, are hereby declared to be null and void." C.G.S. § 47-33e.
Plaintiffs' "root of title" is the administrator's deed from John T. Haney, Administrator C.T.A. D.B.N. of the Estate of Delia Geary, to Leroy E. Forsyth and Nina E. Forsyth, dated September 15, 1943. Exhibit 3.
The court determines that the time "the marketability is to be determined" is April 1992, when this action was returned to this court.
Defendants claim a right of way (1) by virtue of the language, "said premises are subject to a right of way over the same to John Gardner and his heirs and [?]" on the deed from H. Pascal Beckwith to John Borland dated May 1, 1886, i.e. Exhibit 1, (2) by prescription, and (3) as a remnant of an old public highway which existed "from at least 1859 to the present." The court has discussed each of these claims and rejected each of them.
To the extent defendants' claimed right of way over the CT Page 12875 plaintiffs' land "depends on any act, transaction, event or omission that occurred prior to the effective date of the [plaintiffs'] root of title," September 15, 1943, it must fail. C.G.S. § 47-33e.
The defendants have not introduced any evidence to the effect that they, or any of their predecessors in title, filed a notice of claim pursuant to C.G.S. § 47-33f within forty years of plaintiffs' root of title, September 15, 1943.
Quite obviously, defendants' claim based on Exhibit 1, the Beckwith to Borland deed dated May 1, 1886, is rendered "null and void." C.G.S. § 47-33e.
And, defendants' claims to a right of way by adverse user or prescription and by virtue an old public way also must fail to the extent they are based on events which "occurred prior to the effective date of the [plaintiffs'] root of title," September 15, 1943, must fail. C.G.S. § 47-33e.
With respect to defendants' claim of a right of way by adverse user, it is clear that no such right of way was acquired during any fifteen year period beginning with or after September 15, 1943. Nor did any fifteen year period of adverse user "straddle" the effective date of the [plaintiffs'] root of title," September 15, 1943.[10] See II above, pp. 7-20, particularly pp. 17-20.
For the same reasons, defendants' claim of a right of accruing to their property by virtue of an old public way must fail. Certainly, the evidence does not warrant a finding of either "dedication" or "acceptance" occurring after September 15, 1943. See III above, pp. 21-25, particularly pp. 23-25.
 V
The court concludes that the defendants have no right of way or easement of any kind over, across, or through any part of the land owned by the plaintiffs.
For the foregoing reasons, judgment shall enter for the plaintiffs and against the defendants on the complaint and the counterclaims.
Parker, J. CT Page 12876